**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

COOPER BUILDING SERVICES, LLC )
7450 New Technology Way, Suite A )
Frederick, MD 21703 )
)
     *Plaintiff,* )
)   **Case No.:1:25-cv-998**
v. )
)
THE TOWN OF MIDDLEBURG, VIRGINIA )
10 W. Marshall Street, P.O. Box 187 )
Middleburg, VA 20118, )
)
SERVE:    Martin R. Crim, Esq. )
          Town Attorney )
          c/o SANDS ANDERSON )
          725 Jackson Street, Suite 217 )
          Fredericksburg, VA 22401 )
)
     *Defendant.* )
_____ )

## COMPLAINT FOR BREACH OF CONTRACT AND WRONGFUL TERMINATION

    The Plaintiff, Cooper Building Services, LLC ("Cooper"), by counsel, hereby files its

Complaint for Breach of Contract and Wrongful Termination against the Defendant, Town of

Middleburg, Virginia (the "Town"), and in support thereof, states as follows:

### PARTIES

    1.    Cooper is a Limited Liability Company organized and existing under the laws of

the Commonwealth of Virginia, with its principal place of business located in Frederick,

Maryland. All members of Cooper are residents of the State of Maryland.

    2.    Defendant Town is a municipal corporation of the Commonwealth of Virginia,

with its principal place of business located in Middleburg, Virginia.

## JURISDICTION AND VENUE

3.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between Cooper, a citizen of the state of Maryland, and the Town, a citizen of the Commonwealth of Virginia, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.    Venue is proper in this District pursuant to 28 U.C.C. § 1391 because the Town is the sole defendant in this case, this is the judicial district where the Town is located, and a substantial part of the events giving rise to the claims at issue take place in this judicial district.

## FACTUAL BACKGROUND

### A.  Introduction.

5.    Cooper is a general contractor with extensive experience in complex commercial construction projects, including local and federal public projects in the Washington, DC metropolitan area.  At all times relevant hereto, Cooper has held a Class A contractor's license in the Commonwealth of Virginia.

6.    This Complaint arises from the Town's material breaches and wrongful termination of the construction contract for the construction of the new Middleburg Town Hall (the "Town Hall").  The new Town Hall is an approximately 11,400 square foot single-story new town hall building, which includes offices for Administration, Council Chambers, Police Department, Public Meeting Rooms & Public Restrooms.  According to the Town's own website, the Town Hall was "opened for public use on October 30, 2023."[1]

---

[1]    Town of Middleburg Virginia, *New Town Hall Project*, https://www.middleburgva.gov/322/New-Town-Hall-Project (Last visited June 9, 2025).

7.      The Town's breaches were numerous, and all were material.  For example, the Town breached its express and implied obligations not to hinder or delay Cooper throughout the course of the performance of the Project.  The Town actively interfered with Cooper's work and the work of its subcontractors.  The Town breached the implied warranty of the sufficiency and accuracy of the plans and specifications for the Project.  The Town refused to accept responsibility for its own defective design of the Project. The Town refused to issue equitable adjustments for actual and constructive changes imposed by the Town.  The Town wrongfully and in bad faith refused to pay Cooper's payment applications for work performed on the Project.  The Town wrongfully and in bad faith assessed liquidated damages in a punitive manner and as a penalty, due in part to the Town's original failure to budget enough financial resources to pay for the entire Project.  The Town breached its implied duty of good faith and fair dealing in its administration of the contract and refusal to pay for work performed.  The final straw was the Town's wrongful termination of Cooper more than seven (7) months after Cooper had substantially performed its contractual obligations and the Town took occupancy of the Project. The Town is liable to Cooper for the foregoing material breaches, wrongful termination, and under the first breach doctrine.

8.      More specifically, the Town opened the Project for public use on October 30, 2023, yet continued, in bad faith, to assess and accrue liquidated damages against Cooper in a punitive and vindictive manner.  Approximately 7 ½ months later, on June 17, 2024, the Town wrongfully and in bad faith terminated the contract for alleged default.  This termination has caused Cooper to suffer severe financial damages and hardship, has damaged Cooper's business reputation, and has had a negative impact on Cooper's ongoing projects.  This lawsuit seeks to

hold the Town liable for all damages caused by the Town's material breaches of contract and the wrongful termination of Cooper.

**B.  <u>Invitation for Bid and Contract.</u>**

9.      In November 2021, the Town solicited competitive bids through an Invitation for Bid ("IFB") for the construction of the new Town Hall, site development of approximately two acres, and the demolition of the existing town hall (collectively referred to as the "Project").

10.     Downey & Scott, LLC ("D&S") was retained as the Town's Construction Manager and assumed all duties and responsibilities of the Engineer for the Project.

11.     Upon information and belief and at all times relevant hereto, D&S performed and acted within the scope of its role as the Town's Construction Manager and Engineer for the Project, and all such performance and actions were either expressly or impliedly approved by the Town.

12.     Glave & Holmes Architecture, P.C. ("G&H") was retained as the Town's Architect and assumed all duties and responsibilities of the Architect for the Project.

13.     Upon information and belief and at all times relevant hereto, G&H performed and acted within the scope of its role as the Town's Architect for the Project, and all such performance and actions were either expressly or impliedly approved by the Town.

14.     The Town provided  and approved the plans and specifications for the Project, which were prepared by the Town's architect and engineers.  The Town impliedly warranted the sufficiency and suitability of the plans and specifications.

15.     On or about November 1, 2021, G&H finalized the original plans and drawings ("Plans") for the Project.

-4-

COMPLAINT FOR BREACH OF CONTRACT AND WRONGFUL TERMINATION
*Cooper Building Services, LLC v. The Town of Middleburg, Virginia*

16.     On or about November 3, 2021, D&S finalized the EJCOC C-700, Standard General Conditions of the Construction Contract ("General Conditions") and the EJCOC C-800, Supplementary Conditions of the Construction Contract ("Supplementary Conditions") for the Project.

17.     The Plans, General Conditions, and Supplementary Conditions were all included in the IFB for the Project.

18.     As part of their role as Architect and Engineer, G&H and D&S were responsible for reviewing the sufficiency of the design, and when issues with the design were identified, to issue corrective changes so that the contractor's work would not be impacted or delayed during construction.

19.     Prior to the issuance of the IFB, D&S and/or G&H provided the Town with a Project estimate of approximately $6.7 million to complete the Project ("A/E Estimate"). This estimate was unreasonably low given the nature of the high-end design approved by the Town.

20.     D&S and/or G&H oversaw the bidding process and evaluated the bids that were submitted.  D&S and/or G&H were responsible for ensuring that the bids complied with the IFB and that bidders' base bids included all monetary and quantity allowances required by the IFB and specifications.

21.     On November 12, 2021, the Town issued Addendum No. 1 to the IFB (the "Addendum"). The Addendum extended the bid due date to December 8, 2021, and modified the IFB form by instructing bidders to add an additional quantity allowance and unit pricing.

22.     Cooper submitted its bid on December 8, 2021, for a total amount of $10,699,000.00, using the Town's original bid form that was included in the IFB ("December 8, 2021 Bid").

23.     At least four other bidders submitted bids for the Project.  All of the bids were more than 33% higher than the original A/E Estimate of $6.7 million.

24.     The significant discrepancy between A/E Estimate and the bids demonstrate that D&S and/or G&H did not provide a feasible estimate for the completion of the Project.  As a practical matter, this discrepancy also laid the foundation for the Town to hold the contractor selected for the Project to an unreasonably low construction budget and financial constraints.

25.     On December 9, 2021, D&S informed Cooper that the apparent low bidder had withdrawn its bid and that Cooper was now the apparent low bidder for the Project.

26.     On the same day, December 9, 2021, D&S requested additional information from Cooper relating to certain allowances and unit prices required by the Addendum that was not included in the original bid form.  The Town requested that Cooper resubmit its bid using the revised bid form.

27.     As requested, Cooper resubmitted its bid using the revised bid form on December 10, 2021. Cooper's base bid for the contract work remained $10,699,000.00, the same as its initial bid, but included additional quantities for allowances in the event the Town opted to use such allowances during the course of construction of the Project.

28.     Cooper's bid amount, unchanged from December 8 to December 10, 2021, makes clear under any reasonable and objective review of the bid form that the allowance amounts (both in Cooper's original December 8th bid and the revised December 10th bid) were not included in Cooper's base bid price of $10,699,000.00 for the contract work.

29.     Prior to awarding the Contract to Cooper, the Town requested that Cooper provide a Schedule of Values ("SOV") for breakdown and itemization of the $10,699,000 bid.  Cooper submitted the same line-item list that was included in its December 10th bid as its initial SOV.

D&S accepted and approved Cooper's line-item list totaling $10,699,000.00 as Cooper's preliminary SOV. The SOV did not include any allowances.

30.     On January 13, 2022, Cooper and the Town entered into an Agreement for the construction of the new Town Hall ("Phase I") and the demolition of the existing town hall and associated site work ("Phase II") (hereinafter referred to as the "Agreement").

31.     The Agreement incorporated the Plans, the General Conditions, the Supplementary Conditions, and Cooper's December 8, 2021 Bid, among other things (collectively, the "Contract Documents").

32.     The Contract Documents did not list or incorporate Cooper's revised December 10, 2021 Bid.

**C.  <u>Performance and Delays on the Project.</u>**

33.     The Town issued the Notice to Proceed to Cooper on January 26, 2022.

34.     Cooper thereafter commenced work on the Project. At all times relevant, Cooper performed its work on the Project in a good and workmanlike manner.

35.     However, Cooper's progress on the Project was substantially delayed by the Town and its agents, changes in the work, defective specifications, and other delays beyond Cooper's control.

36.     These delays include delays caused by D&S in approving specifications for equipment that could not be timely procured, installed, and commissioned, and by agents of the Town, such as the Town Manager and Town Clerk, interfering with Cooper and its subcontractors by improperly appearing at the project site and directing Cooper's subcontractors to do work not assigned by Cooper and not specifically required in the Contract Documents.

37.    The delays were also caused by the Town's own unreasonable insistence on having certain systems that were unnecessary, such as an Italian chiller system that was impossible to acquire in the timeframe set by the Town, and its refusal to mitigate the delays by accepting comparable systems suggested by Cooper.

**D.  Improper Rejection of Proposed Change Orders.**

38.    During performance, Cooper timely submitted PCOs and certified claims for additional work and time extensions caused by the Town, including actions taken by its Town Manager, Town Clerk, D&S, G&H, and other agents, caused by defective specifications, or caused by other changes in the work.  The Town consistently refused to authorize change orders and refused to make payment or issue appropriate time extensions for such extra work and defective specifications.

39.    Under Article 11 § 11.02 of the General Conditions, the Contract states that it **shall** be changed through change orders for:

- Changes in Contract Price or Contract Times which are agreed to by the parties, including any undisputed sum or amount of time for Work actually performed in accordance with a Work Change Directive;

- Changes in Contract Price resulting from an Owner set-off, unless Contractor has duly contested such set-off;

- Changes in the Work which are: (a) ordered by Owner pursuant to Paragraph 11.05, (b) required because of Owner's acceptance of defective Work under Paragraph 14.04 or Owner's correction of defective Work under Paragraph 14.07, or (c) agreed to by the parties, subject to the need for Engineer's recommendation if the change in the Work involves the design (as set forth in the Drawings, Specifications, or otherwise) or other engineering or technical matters; and

- Changes that embody the substance of any final and binding results under: Paragraph 11.03.B, resolving the impact of a Work Change Directive; Paragraph 11.09, concerning Change Proposals; Article 12, Claims; Paragraph 13.02.D, final adjustments resulting from allowances; Paragraph 13.03.D, final

adjustments relating to determination of quantities for Unit Price Work; and similar provisions.

40.     General Conditions Article 11.09 provides the change proposal procedures, which required Cooper to submit a PCO to the Engineer to request an adjustment in the "Contract Times or Contract Price;…challenge a set-off against payment due; or seek other relief under the Contract." Cooper submitted multiple PCOs for changed work *and* to contest unjustified and punitive withholding of payments by the Town.

41.     Furthermore, General Conditions Article 4.05, entitled "Delays in Contractor's Progress" provides:

- "A. If Owner, Engineer, **or anyone for whom Owner is responsible** delays, disrupts, or interferes with the performance or progress of the Work, then Contractor *shall be entitled* to an equitable adjustment in Contract Price or Contract Times." and

- "C. If Contractor's performance or progress is delayed, disrupted, or interfered with by unanticipated causes not the fault of and beyond the control of Owner, Contractor, and those for which they are responsible, then Contractor *shall be entitled* to an equitable adjustment in Contract Times. (emphasis added).

42.     Cooper properly submitted several Change Orders for which it was entitled to equitable adjustments in Contract Times and Contract Price throughout its performance on the Project. However, the Town repeatedly shirked its responsibilities under the Contract and breached its obligation to issue appropriate change orders.

### 1)  *PCO 10R1 – Alternate Electrical Panels ($299,030)*

43.     On May 25, 2022, the Town's Architect, Glave & Holmes Architecture, P.C. (the "Architect") issued Architect Supplemental Instruction ("ASI") 12. This change in design was the responsibility of the Town and its Architect. Under the General Conditions, Cooper was not responsible for the adequacy of performance or design criteria specified by the Town.

44.    ASI 12 required the resubmittal of the electrical studies and equipment because Dominion Power would not approve the installation of the transformer as shown on the drawings and required an alternate building and electrical services design, resulting in design changes.

45.    The Architect's design changes to the electrical panels extended the fabrication duration for the electrical service equipment, which impacted the critical path schedule.

46.    In July of 2022, the Town approved the release of the electrical equipment. Cooper informed the manufacturer of the approval, but the manufacturer then informed Cooper that the lead time for the electrical equipment was approximately one year.

47.    Without mitigation, the critical path would have pushed the project completion of Phase I off by 317 calendar days. However, Cooper and the Town developed a mitigation plan where alternative electrical panels would be ordered.  The Town was fully aware of the impact of this change on the critical path of the schedule.

48.    Cooper submitted a Time Impact Analysis ("TIA") reflecting the mitigation plan's impact on the Project schedule, which showed that the mitigation plan reduced the net delay to only 78 calendar days (rather than the 317 days that was originally forecasted for the change).

49.    After reviewing the TIA, the Town incorporated PCO 10 into Change Order No. 2, which Cooper signed.  Cooper signed Change Order No. 2 with a full reservation of rights reiterating that PCO 10 did not include general conditions or a request for a time extension.

50.    The Town refused to sign Change Order No. 2 until the reservation of rights language was removed but agreed to allow Cooper to resubmit PCO 10 to include time and costs as a separate change.  The Town was on full notice of Cooper's rights for both time and costs attributable to this change.  The Town was also aware that without the mitigation plan that had

been agreed upon by both the Town and Cooper, PCO 10 would have resulted in a 317 day total delay to the Project schedule.

51.     Cooper timely resubmitted as PCO 10R1 on February 27, 2023, which included Cooper's general conditions and the time extension.  Cooper was entitled to this time extension under General Conditions Article 4.05(A) since the PCO arose directly from the Town's Architect's design change.

52.     The Town rejected PCO 10R1 on April 24, 2023, despite the fact that the Town directed Cooper to resubmit PCO 10.   This was a material breach of contract.

53.     Notwithstanding the Town's material breach, Cooper thereafter continued to request payment for costs and a time extension associated with the change. Cooper timely submitted a claim for PCO 10R1, which the Town rejected on August 14, 2023. In response, the Town told Cooper that it "might" consider a claim for time and costs for this change order at a later point in the Project.   However, the Town did not grant any time extension for the design change, in violation of both General Conditions Article 4.05(A) and the implied duty of good faith and fair dealing.

54.     At all times relevant hereto, Cooper timely performed all contractual obligations relating to the recovery under PCO 10R1, which was wrongfully rejected by the Town in breach of the Contract.

### 2)  *PCO 38 – Electrical Pad Changes ($156,837)*

55.     PCO 38 was also caused by the Town Architect's changes in ASI 12. The design change required Cooper to relocate the concrete pads for the generator from the north side of the Project to the south side.

56.     ASI 12 required changes to electrical and civil drawings from the Town's Architect, but the Town failed to update the drawings and plans. This caused delays in Cooper's ability to pour the external concrete pads and its ability to complete the electrical installation for permanent power.

57.     By the time the inconsistencies in the drawings were discovered, the electrical installation was on the critical path and causing a day-to-day delay.

58.     Cooper mitigated the delay as much as possible but the defects in the design resulted in a 53-day delay. Cooper submitted a TIA to the Town showing the 53-day delay.

59.     Cooper timely submitted a claim for PCO 38, which the Town rejected on August 14, 2023. The Town again told Cooper that it might consider a claim for time and costs for this change at a later point in the Project. However, the Town did not grant any time extension for the design change.  Less than one month later, as stated below, the Town refused to pay any further payment applications due to alleged liquidated damages that could not have been assessed had the Town properly approved a time extension for this change.

60.     This is yet another example of a material breach by the Town.

61.     At all times relevant hereto, Cooper timely performed all contractual obligations relating to the recovery under PCO 38, which was wrongfully rejected by the Town in breach of the Contract.

### 3)  *PCO 48R1 – Depressed Curb ($47,664)*

62.     During performance of the work, Cooper installed a 6-inch concrete curb around the perimeter of the East side of the New Town Hall. D&S, the Town Manager, and the Town Clerk witnessed and approved the installation of the curb.

-12-

COMPLAINT FOR BREACH OF CONTRACT AND WRONGFUL TERMINATION
*Cooper Building Services, LLC v. The Town of Middleburg, Virginia*

63.    D&S and the Town later approved Cooper's payment application for the curb as originally installed at the Project.

64.     Cooper had installed the 6-inch curb pursuant to the details on the Plans.

65.    After an issue was later raised about the depressed curb, and following the Town's direction, Cooper submitted Request for Information ("RFI") 138 stating:

- C3.0 calls for CG-2 on the east side of the building. There is also a note for a "depressed curb". No detail is provided for a "depressed curb".

- Detail for CG-2 on C1.2 shows asphalt 6" below top of curb. Per request, see attached as-built elevations from the surveyor for top of curb.

66.    In response, Cooper received comments from the Town and its Civil Engineer, but those comments did not correct the defective design or provide guidance for Cooper relating to RFI 138.

67.    The drawings were defective, and the grading elevations shown on the plans for the curb and the pavement were incompatible.  Nonetheless, the Town directed Cooper to remove and replace the depressed curb in locations that were not shown on the Plans, which Cooper performed under a reservation of rights.

68.    Cooper timely submitted its claim for PCO 48R1, which the Town rejected on August 14, 2023, in breach of its obligations under the Contract.  This was the same day the Town rejected PCO 38.

69.    At all times relevant hereto, Cooper timely performed all contractual obligations relating to the recovery under PCO 48R1, which was wrongfully rejected by the Town in breach of the Contract.

### 4) *PCO 62 – Chiller Delays ($534,528)*

70.    The Town's Italian-manufactured chiller has been an ongoing issue since the Town's initial selection of the Unit as part of its design specifications for the Project.

71.    The Town identified three chiller manufacturers for use on the Project. After submitting the bid, and during the meeting to try and cut costs, Cooper recommended using a different chiller system to reduce the Town's costs and because the Town's selected chiller was a unique and uncommon unit.

72.    Cooper recommended a domestic unit and informed the Town that Cooper was concerned that the lingering supply chain effects of COVID-19 and the geo-political climate were more likely to negatively impact an overseas unit.

73.    The Town rejected Cooper's proposed alternative but gave no reason for doing so.

74.    Cooper submitted its proposal for the Town's chiller unit, and its submittal was approved on May 2, 2022. The chiller was released for fabrication the same month.

75.    In October of 2022, Cooper was informed that the chiller would not be delivered as scheduled. In November of 2022, Cooper was provided with a new expected delivery date of January 2023 by the manufacturer's representative.

76.    Days later Cooper received a letter from the chiller distributor stating that the manufacturer was "facing a global shortage of main components for our units … The factory is just not able to keep up with the confirmed production times or give new dates for production in most cases until the components [*sic*] delivered."

77.    This confirmed to Cooper that the Town's design for the project was defective and deficient as the Town's selected chiller could not be timely procured at no fault of Cooper.

78.    Cooper informed the Town of the delay and provided a mitigation plan where Cooper would procure and install a temporary air handling unit (an "OAU"). The Town agreed and the OAU was timely installed. The OAU provided heat to the Project and allowed finishes to be installed within the Project until the chiller could be delivered.

79.    Cooper and its HVAC contractor worked with the Town to secure air shipment of the chiller rather than shipment via boat. Cooper submitted, and the Town approved, PCO 51 for the shipping costs.

80.    The chiller was delivered on May 16, 2023.

81.    Cooper's mitigation efforts reduced a 252-day delay to only 183 days.

82.    Cooper was entitled to an equitable adjustment in Contract Time pursuant to General Conditions 4.05(C), as Cooper's performance was delayed by unanticipated causes that were not the fault of Cooper. The delayed delivery of the chiller was solely caused by the Town's selected chiller manufacturer.

83.    Cooper thereafter timely submitted a 183 calendar-day time extension for PCO 62, which the Town wrongfully rejected on October 23, 2023.

84.    At all times relevant hereto, Cooper timely performed all contractual obligations relating to the recovery under PCO 62, which was wrongfully rejected by the Town in breach of the Contract.

### 5)  *PCO 72R1 – Installation of the Balancing Valve ($106,526)*

85.    Once the chiller was delivered to the Project, the Town's selected chiller was found to have mechanical defects that were outside of Cooper's control which impacted the critical path of the Project.

86.     Cooper worked with the Town and its consultant to find solutions to the mechanical issues, and ultimately the parties agreed to install a balancing valve.  The balancing valve was installed on the Project on August 28, 2023.

87.     Cooper submitted PCO 72 for the direct costs of the balancing valve installation. PCO 72 contained language reserving Cooper's rights to general conditions costs and a time extension.

88.     The Town agreed that Cooper was entitled to the costs but wrongfully rejected PCO 72 because it included the reservation of rights language. Cooper then submitted a TIA to showing a 45 calendar-day time extension that was due for the change associated with the balancing valve.

89.     Cooper timely submitted PCO 72R1, which the Town improperly rejected on April 30, 2024.  Thereafter, Cooper resubmitted a certified claim for the costs and time in PCO 72R1 on May 31, 2024. Prior to the Town's deadline to respond to the certified claim, however, the Town wrongfully terminated Cooper for default.

90.     At all times relevant hereto, Cooper timely performed all contractual obligations relating to the recovery under PCO 72R1, which was wrongfully rejected by the Town in breach of the Contract.

91.     The common thread between all PCOs listed above is the Towns refusal to grant required time extensions and pay for additional work that was performed by Cooper due to either the Town's defective design or delays outside of Cooper's control. The Town repeatedly rejected Cooper's PCOs because Cooper reserved the right to submit time and costs, instead requiring Cooper to resubmit PCOs including its claims for time and costs only to, again, deny the PCOs.

The Town's actions required Cooper to pay substantial project costs that it should never have had to pay in order for Cooper to substantially complete the project.

92.     In addition to the examples listed above, the Town caused other actual and constructive changes on the Project for which Cooper is entitled to compensation.

93.     The Towns refusal to approve changes and claims were a material breach of the Town's obligations to Cooper under the Agreement.

94.     Despite the Town's refusal to issue all appropriate change orders for both extra work and time extensions, Cooper nonetheless substantially performed all work required by the Contract until it was improperly and wrongfully terminated, as described in more detail below.

### E.  <u>Withheld Payment for Payment Application Nos. 17-26</u>

95.     As required by the Contract Documents, Cooper submitted payment applications for work performed on the Project on a periodic basis to D&S and the Town.  While some issues relating to work performed and changes arose between the parties on some of the early payment applications, the Town eventually approved and paid Cooper for Payment Application Nos. 1-16 for the work performed on the Project.

96.     That all changed with Payment Application No. 17.  On August 14, 2023, Cooper submitted Payment Application No. 17 to the Town for a progress payment of $212,138.99 for work performed on the Project through July 31, 2023.

97.     Notwithstanding the many delays and changes that that had been imposed on Cooper, Cooper substantially completed Phase I of the Project and submitted the Phase I punchlist to the Town on September 8, 2023.[2]

---

[2]     Approximately one month later, the Town opened the New Town Hall for the public use on October 30, 2023.

98.     Several days later, on September 12, 2023, the Town notified Cooper that it was withholding the entire amount due under Payment Application No. 17, allegedly due to assessed liquidated damages and for the disputes related to the Allowances.

99.     The Town issued nearly identical withholding notices for Payment Application Nos. 18-26.  Since September 2023, the Town has refused to pay Cooper for any further work performed on the Project.

100.     The Town is currently withholding approximately $1.35 million of the Contract balance from Cooper, which excludes the amounts owed for the PCOs.

101.     At all times relevant hereto, Cooper timely performed all contractual obligations, including the submission of PCOs and certified claims, relating to Cooper's rights to receive payment in full for Payment Application Nos. 17-26, which the Town wrongfully and in bad faith refused to pay.

102.     The Town's withholdings of the payment applications are also a material breach of contract.

103.     Article 4 § 4.01(B) of the Contract specifically states that the assessment of liquidated damages is the **sole and exclusive remedy** for any delay.  However, the Town has stated it is withholding payment not only for liquidated damages but for other "delay costs" in violation of the express terms of the Contract.

104.     The Town is not entitled to any liquidated damages under the Contract as the delays were not caused by Cooper.  The Town has also withheld duplicative amounts due to Cooper under the payment applications by claiming both liquidated damages and time-related actual damages. Such is a material breach of Contract.

-18-

COMPLAINT FOR BREACH OF CONTRACT AND WRONGFUL TERMINATION
*Cooper Building Services, LLC v. The Town of Middleburg, Virginia*

105.    The Town is improperly withholding an additional $453,333 for disputed allowances which the Town is aware were not included in Cooper's base bid.

106.    Perhaps even more telling, in direct breach of the terms of the Contract Documents and implied duties of good faith and fair dealing, the Town has continued to assess liquidated damages against Cooper for alleged Phase I delays even after it accepted occupancy and opened Phase I to the public on October 30, 2023.

107.    Even after the Town refused to pay for the work performed on the Project, Cooper continued to work in good faith to finish Phase II and to address the Town's comments relating to the punchlist for Phase I.

108.    Cooper submitted its final punch list on March 14, 2024.

**F.  Project Closeout**

109.    The Contract contemplates three milestones: (1) occupancy, (2) substantial completion, and (3) final completion.

110.    General Conditions Article 1.01(A)(42) defines substantial completion as:

The time at which the Work (or a specified part thereof) has progressed to the point where, in the opinion of Engineer, the Work (or a specified part thereof) is sufficiently complete, in accordance with the Contract Documents, *so that the Work (or a specified part thereof) can be utilized for the purposes for which it is intended*.
(Emphasis added).

111.    General Conditions Section 15.03(A) instructs that:

Contractor shall notify Owner and Engineer in writing that the entire Work is substantially complete and request that Engineer issue a certificate of Substantial Completion. Contractor shall at the same time submit to Owner and Engineer an initial draft of punch list items to be completed or corrected before final payment.

112.    Cooper submitted its initial draft punch list for Phase I in early 2023. Several months later, in July 2023, the Town Manager, Town Clerk, Civil Engineer, Architect, and D&S

-19-

COMPLAINT FOR BREACH OF CONTRACT AND WRONGFUL TERMINATION
*Cooper Building Services, LLC v. The Town of Middleburg, Virginia*

inspected the Project over the course of several days, but advised Cooper that they were not inspecting the Project to determine substantial completion. The Town instead used the inspections to create an extra-contractual Owner "noncomplete work list," which conflated outstanding work, punch list work, and warranty work. Punch list and warranty work are not required to be completed prior to a project reaching substantial completion.

113.    The Town refused to acknowledge even *partial* substantial completion of Phase I of the Project.  Nonetheless, the Town took occupancy of the New Town Hall on October 26, 2023, and opened the New Town Hall for public use on October 30, 2023.  The Town has used the New Town Hall for its intended purpose since then.

114.    The Town has taken inconsistent positions regarding the completion of the Project. Currently, the Town is taking the position that substantial completion still has not been reached on either Phase I or Phase II. However, the Town informed Cooper in May of 2024 that Cooper needed to request a final inspection which, under the Contract, only occurs after substantial completion.

115.    In response, in May 2024, Cooper requested the final inspection at a Town Hall meeting, but the Town rejected Cooper's request for a final inspection, claiming that the Town would not conduct a final inspection until Cooper completed all items on the Town's noncomplete work list.  Cooper had already completed all work required for substantial completion and was being held hostage by the Town for alleged warranty and punch list work.

116.    Cooper has continually made good faith efforts to address the items contained in the Town's noncomplete work list, even the items that are <u>not</u> Cooper's responsibility under the Contract, in an attempt to close out the Project.

-20-

COMPLAINT FOR BREACH OF CONTRACT AND WRONGFUL TERMINATION
*Cooper Building Services, LLC v. The Town of Middleburg, Virginia*

117.    However, Cooper could not close out the Project because the Town continuously added extra-contractual work and refused to provide a certificate of substantial completion or schedule a final inspection until the extra-contractual work was completed. The actions by the Town are yet another example of a material breach of contract.

**G. <u>Wrongful Termination for Default</u>**

118.    On June 17, 2024, ten days before a contractually mandated mediation which had already been scheduled by the parties relating to the outstanding changes and time extension requests and unpaid payment applications, the Town wrongfully issued Cooper a notice of termination for default (the "Notice").

119.    In the construction industry, termination for default is used when a contractor has failed to fulfill the contract's purpose. Here, the Contract was for the construction of the new Town Hall. Cooper fulfilled the Contract's purpose, as the Town has had beneficial use and occupancy of the new Town Hall since October of 2023.

120.    The Town issued the Notice *after* it had been occupying and using the Town Hall for over seven months. The Town Hall already had a grand opening event and had been open to the public since the Town took occupancy. The Town's occupancy and use shows that there was no merit to the issuance of the Notice.

121.    The Notice did not specifically address the basis for the Town's termination and instead simply included vague and conclusory statements.

122.    The Town's Notice was wholly without merit and a final and drastic material breach of contract. Under General Conditions Article 16.02(D), the Town could not terminate the Contract if Cooper, within seven days of the receipt of a notice of intent to terminate, began to correct any alleged failures and diligently proceeds to cure such alleged failures.

123.    Cooper responded to the Notice on July 3, 2024, providing details showing that the outstanding items identified on the Project by the Town had been performed by Cooper within seven days of the notice of intent to terminate, and showing that almost all work had been completed prior to termination.

124.    The Town responded on July 10, 2024, stating that the Town stood by the Notice of Termination by Default.

125.    The Town materially breached the Contract by wrongfully terminating Cooper.

126.    At all times relevant hereto, Cooper timely performed all contractual obligations relating to the recovery of damages for the wrongful termination of the Contract.

127.    All conditions precedent to filing this suit and the recovery of the damages claimed herein have been performed, satisfied, waived, or excused.

## COUNT I – BREACH OF CONTRACT AND WRONGFUL TERMINATION

128.    Cooper incorporates all preceding paragraphs as if fully stated herein.

129.    The Contract is a binding and enforceable agreement between the Town and Cooper.

130.    Cooper properly furnished all labor and materials as required under the Contract.

131.    Cooper has performed all of its obligations under the Contract required to be performed as of the date of filing this Complaint.

132.    The Town materially breached the Contract by, among other things:

- Breaching its express and implied obligations not to hinder or delay Cooper throughout the performance of the Project;

- Actively interfering with Cooper's work and the work of its subcontractors;

- Breaching the implied warranty of the sufficiency and accuracy of the plans and specifications for the Project;

-22-

COMPLAINT FOR BREACH OF CONTRACT AND WRONGFUL TERMINATION
*Cooper Building Services, LLC v. The Town of Middleburg, Virginia*

- Failing to timely and fully compensate Cooper for work performed on the Project and wrongfully withholding payment from Cooper in violation of the Contract;

- Refusing to grant required time extensions in accordance with the Contract;

- Wrongfully and in bad faith assessing liquidated damages in a punitive manner and unreasonable manner and as an unenforceable penalty;

- Refusing to pay Cooper for changes to the work that were either caused by the Town, caused by defective plans and specifications, or not the fault of Cooper;

- Refusing to issue equitable adjustments for actual and constructive changes imposed by the Town during the course of the Project;

- Wrongfully terminating Cooper for default despite Cooper substantial performance and in violation of the Contract;

- Failing to act in good faith and deal fairly under the Contract; and

- Such other material breaches that may be discovered in litigation.

133.    As a direct and proximate result of the Town's material breaches of the Contract and wrongful termination, Cooper has suffered, at minimum, damages in the amount of $3,000,000.00, or according to proof at trial, plus interest and costs.  This includes damages for all actual, compensatory, special, direct and consequential damages, including unpaid labor, material, services, reasonable overhead and profit provided to the Project prior to termination, and such other damages as may recoverable under the law and proven at trial.

## COUNT II – DECLARATORY RELIEF
### Declaratory Judgment that the Termination for Default was Wrongful

134.    Cooper incorporates all preceding paragraphs as if fully restated herein.

135.    A justiciable controversy exists between Cooper and the Town as to the Parties rights under the Contract.

136.    Specifically, a controversy exists relating to the Town's arbitrary and capricious decision to terminate Cooper for default after Cooper had substantially performed under the Contract, and after Cooper began to diligently perform to correct the Town's perceived defects within seven days of receipt of the Town's May 15, 2024, Notice of Intent to Terminate for Default Letter.

137.    After receiving the Town's May 15, 2024, letter, Cooper diligently began performing work within seven days.

138.    Pursuant to General Conditions Article 16.02(D), the Town was not lawfully permitted to terminate Cooper for default since Cooper had substantially performed under the Contract, Cooper had begun to correct what the Town perceived as Cooper's failure to perform and Cooper diligently proceeded to cure the Town's perceived failures within seven days of receiving the May 15, 2024, letter.

139.    The termination for default was made in bad faith and without just cause.

140.    Cooper has been adversely affected by the Town's termination for default. Cooper can no longer bid on many state and local public contracts since the disclosure of the Town's termination for default is required. The termination for default also has the potential to lead to debarment in federal contracts.  All of this is due to the Town's wrongful termination for default.

141.    In light of the foregoing, Cooper respectfully invoke the authority of this Court under Rule 57 and 28 U.S.C. § 2201 to declare on behalf of Cooper that:

a)    The Town did not have the authority to terminate Cooper for default under the Contract given the language of General Conditions Article 16.02(D) and the fact that Cooper substantially performed under the Contract,

b)      The termination for default was wrongful and a material breach of the Contract; and

c)      That the Town's termination for default be declared unlawful and void.

## PRAYER FOR RELIEF

WHEREFORE, Cooper prays for judgment in its favor against the Town as follows:

1.      For an award of actual, compensatory, special, direct and consequential damages in an amount to be proven at trial, plus costs, pre- and post-judgment judgment interest, and such other damages as may recoverable under the law;

2.      For a declaratory judgment that the Town's termination for default of Cooper was wrongful and a material breach of the Contract and that the termination is declared to be unlawful and void; and

3.      For such other and further relief as the Court may deem just, equitable and proper.

## DEMAND FOR TRIAL BY JURY

Cooper demands a trial by jury on all issues so triable.

Dated: June 12, 2025                    Respectfully Submitted,

/s/ David Hilton Wise
David Hilton Wise, Va. Bar No., 30828
Dylan Scout Graham, Va. Bar No., 100051
WISE LAW FIRM, PLC
10640 Page Avenue, Ste 320
Fairfax, Virginia 22030
Tel:    (703) 934-6377
Fax:    (703) 934-6379
dwise@wiselaw.pro
dgraham@wiselaw.pro
*Counsel for Cooper Building Services, LLC*